We'll hear your argument next in 15-1355, Texchem Advanced Products against E.pak International. Mr. Assessor, please. Thank you. May it please the Court. Stephen Susser for E.pak International. This decision by the trial court judge presents a danger because it is an obviousness approach that lacks any tether to the references. Certainly, it opens the door to a hindsight-based approach in what is crowded art where small improvements can make a big difference. Indeed, it presents a danger for judges and lawyers to stand in the place of those of skill in the art in deciding these questions. I'm not suggesting that the sky is going to fall if we don't rule with you, are you? Much as I would like to. No, the sky will not fall, Your Honor, if you do not rule with me, although I will be disappointed. It's more significant than just this case, certainly, because what it does is it takes away that limitation on the hindsight-based approach where you can combine anything in the prior art and it just seems right to do so. I found a case of a safety belt that added a second strap, so the lap belt was the norm and add a strap across the chest. Well, that was a safety belt plus a shoulder harness, yet it was patented and, of course, we use them today. So, things that now seem obvious, or why didn't I think of that, at the time of the invention were not obvious, and unless there's a reason to combine, which is still the law and still the standard, unless there is a reason to combine, then you risk having the judges and the lawyers substitute their determination for what one of ordinary skill in the art would have seen at the time. It all depends pretty much on the record evidence in the particular case, so maybe you should move from the generalities to the specifics here. Yes, Your Honor. Claim 14. Start with 14. I'm going to start with 14, Your Honor. Claim 14 was reducing a canister for wafers with four latches, two of which had cross members that blocked two of the four openings. There was no prior art of record at all for blocking with cross members two of four openings, none. But that's not required, right? You don't actually have to find in the prior art, in the sense of documents, each element, as long as one of skill in the art facing market pressures, design pressures, other motivations that a skilled artisan would be facing would, when presented with the problem, think of this. You don't have to find every element in a piece of prior art. I beg to differ. I do think that you cannot skip one of, let's say, three elements or limitations of a claim and just say, we have prior art that shows two. We don't have any prior art that shows a third. And a skilled artisan would have found it obvious to make a modification. Well, that goes to, Your Honor, it might be common sense for one of skill in the art to move from a reference that covers two of the limitations to a reference that covers the third limitation. But that does not extend to allowing that person, that individual, to create that third limitation when there's no prior art that covers that limitation. Well, if I understood the problem, you ended up with two holes that were not helpful, so we blocked them. But what is nonsensical or totally imaginative, creative about that? What else would you do with them? Well, up until that time, Your Honor, there had not been a four-opening container. Right. So we created a problem. Which you solved very readily by just sticking a little piece of metal behind it. Again, in hindsight, it seems clear. First, one didn't need to solve the problem at all, because it just meant the operator would have to pay more attention to where he placed the container. The Lewis reference noted the possibility of using four latches. Is that right? Correct, Your Honor. And it was well recognized in the art with the machinery used to place these things together that you couldn't have four openings. You could only have two openings to get them aligned properly. Is that right? No, that's not exactly correct, Your Honor. You could still place the container with four openings. It's just the operator would have to choose which ones to use. Would have to make an alignment choice at the time of placing the container in the appropriate position on the loading machine. To avoid having to make that decision, you would only want two openings or you would want the other two blocked? Other two blocked, Your Honor, or placed in a different position, or an arrow pointing to the two good openings. Wouldn't that have been understood by those of skill in the art, that there was an orientation situation where if there were four openings, you would have to make a decision? On the other hand, if there were only two openings, then that would avoid having to make that choice? Isn't that enough of a teaching to suggest that if you want to use two latches, you better do something to cover up two of them? If you want to use four latches, you better do something to cover up at least two of them to avoid this problem with orientation? I don't think it would have been clear, Your Honor. I say that because Lewis, which does mention four openings, says nothing about covering two with cross members or anything else. If it were so obvious, why wouldn't Lewis, two years before our invention, think of doing it when he talked about his four openings? The fact is that you can still use a container with four latches and not block two. Blocking two is a clever way to ease the process of loading, but one of many options. One option, again, being putting color coding on two of the four. But the difficulty in the process of loading was known to those of skill in the art. No, not exactly, Your Honor, only because no one had ever done a four-opening container before. What was known is that the machines that were going to be used, at least some of the machines going to be used, had two placement pivots or placement points, and those corresponded to two openings in the bottom of the container. The idea of four openings was known. It had never been practiced before, but it was in the Lewis patent, but four openings without these cross members that you have here on two of the four. I hate to say it, but wouldn't common sense suggest that among the options for fixing it would be to put a little piece of metal on it? I'm not sure about at the time, going back. Again, there were a number of different ways to deal with it if you wanted to deal with it. Again, Lewis chose not to deal with it, but if you wanted to deal with it, you could have moved two of these four openings, for example, could have been set. Could have done any number of things. If we sat down with an engineer, there are probably dozens and dozens of different ways to accomplish the same thing. Our invention was we were the first to come up with it when there had been a need in the industry for a long time, and we were the first ones to invent it. Are you arguing that if there's three or four ways of doing something, the first person who picks one has made an invention that cannot possibly be thought of as obvious? I would say perhaps, actually, yes. I mean, if we're not talking about a very limited, where there's only one choice, let's say, or two well-known choices and none others, then maybe we have a different situation under KSR. But that's not what we have here. We have no one having done it in a crowded art where, for example, TFAP's chief engineer came up with a shorter latch that was patented, and he didn't think it was obvious. It was just a less tall latch. That's because it would be less likely to interfere with the loading arm. It was an improvement. It was a movement forward, and that's what we really want to do is allow that movement forward. Especially when there is no prior art that had even discussed it. We are being penalized here because we came up with a, we recognized a problem and came up with a solution. That's exactly the wrong incentive. We were the first to deal with this, and the judge said, because we, Cliff Haggard, one of the inventors, recognized a problem and thought of a way to deal with it, that makes it obvious. He's one of ordinary skill in the art, so anybody else of ordinary skill in the art would have thought of it. Under that standard, I don't know what's left. Well, the judge didn't quite say that. The judge didn't say, because he thought of it, any old ordinary skilled artisan would. I thought what he said was that that is actually evidence, based on what Haggard said and what other people said, that an ordinary skilled artisan would have thought of that. I guess, what he said, Your Honor, was, the inventor's awareness of the problem and solution provides evidence that a person of ordinary skill in the art would also be aware of the problem and the solution. Right, but the judge didn't stop there and say, QED. No, he didn't. He went on to say, inherent in that general awareness and motivation of the alignment problem, in this case, is the solution EPAC used to block the holes in the end wall. Just because we knew that there was an issue with a machine that had accommodated two holes and we wanted to put four holes, doesn't mean we had the solution. Part of the invention is recognizing a problem. We recognize the problem. We came up with what's really an elegant solution to it, and now we're being penalized for it. It's used against us when there was no prior art. Are you saying that no one else, no other person of skill in the art, would have known that if there were two extra holes on the end wall, that would cause alignment problems? I thought that the prior art made that pretty clear, that that was well known by pretty much everybody in this art, that there are alignment mechanisms that require some orientation. But, Your Honor, that's only because we were the first to think of and put into commercial application a four-latch canister. I'm not talking about that. I'm talking about just this statement, the statement in the district judge's opinion. It referenced Jim Haggard. He said he knew the two extra holes on the first end wall would cause alignment problems. And then he goes on to say that Haggard's awareness provides evidence that a person of ordinary skill in the art would also be aware of the problem. And you're not arguing that Haggard was the only one that was aware of this? No. Because I understood from the record that this was well recognized by those of skill in the art, that there were alignment problems or that the alignment required two holes and not four. I do not think so, Your Honor. I think that there was a recognition, there was testimony that there was a recognition that the machine for loading only had two placement positions. And by adding four holes, that could be something that one might need to consider dealing with. But that was it. It was not, since no one had ever come up with a four-latch container for commercial application, that had not been faced before. We were the ones who had to deal with it. How do we deal with it? Do we partially block? Do we fully block? Do we offset? Do we put arrows? Again, among all the different possibilities at the time, they sat back and they came up with an invention. And again, I add, there was nothing in the prior art that would say, use cross members in this situation. Well, you don't have to have a specific piece of prior art that says that, do you? Well, if you don't, does that not open up one to say, well, it would have been obvious to add this limitation. You've got two or three limitations. Let's just add one. It becomes an anticipation plus type of analysis as opposed to obviousness. If obviousness was left solely to a combination of known instructions in the prior art, almost nothing would ever be obvious. What would the meaning of known to someone of ordinary skill in the art possibly mean? It would take no requirement of thought at all. All you have to do is read the books and say, uh-huh. There are situations where there are, in the prior art, references that cover all of the elements of a claim. Then the question is, was there a reason to combine those two or more references? Right, but the doctrine also always adds to combination the word modification. It's not just combinations that qualify as a sufficient basis with the right testimonial support for motivation to combine. It's also motivation to modify, which seems to me to have to cover situations in which some element is not found in some piece of prior art. But isn't that, Your Honor, the inventive process to recognize that there's something in the prior art that isn't there? Well, isn't the answer, it can be. It depends on how well supported the case is for the proposition that there really was a motivation to make this modification. But modification, Your Honor, using known elements. Again, it's that unknown factor where the inventor moves forward by creating something that hitherto had not existed, which is the essence of the system, Your Honor. And if we take it away from that foundation, there's a risk of losing the fact that after something is invented, it may well seem obvious when before no one had thought of it. And in this case, of course, I didn't even talk about the secondary consideration, and I don't have time. I will restore your rebuttal time, but Mr. Walker, I want you to continue. Thank you, Your Honor. Good morning, Your Honors. Kent Walker on behalf of TexCAMP. We didn't talk about Claim 13, so I will just jump to 14. So the district judge's opinion, I guess it's really paragraphs 5 through 7, are the key ones on 14. And what I want to, I guess, ask is this. Up to a particular sentence, namely the second sentence of paragraph 7, the court says Jim Haggard noticing the alignment problem. That helps tell us that an ordinary skilled artisan would notice the alignment problem. EPAC's expert testified that a person of ordinary skill in the art would have been aware of the potential alignment problem and would try to solve it. And then, it seems to me, is the key sentence where the judge says, inherent in that general awareness and motivation is the solution EPAC used to block the holes in the end law. What's the evidence for moving from recognition of the problem, that there's an alignment problem with this kind of machine, to motivation to adopt this solution? There's the evidence that you mentioned of Mr. Haggard and the expert Kimmel, I think was in there too, that both admitted that you had market forces telling you that you had conventional machinery that you need to make these containers fit on so that the wafers could be loaded into them, that there were basically two directions because there were two prongs in the machine. Everyone who was in the market knew it, and if you were going to make these containers, you had to make them fit that. Right, but having two extra holes still allows the container to fit. It just increases the chance of error, right, by a 90-degree rotation. Yes. Or three other. Well, that testimony said you want to get it right because you want to satisfy your customers. The patent itself... Right, so what is the evidence that... I'm just looking at what the district court found. The district court found ordinary skilled artisan would have recognized the need for alignment on the machine that was going to be using these things. I guess it's a filling machine, is that what it is? Yes. But the district judge doesn't cite or even assert that the expert or some other piece of evidence shows that this solution was an obvious solution to a recognized problem. He just gets to the recognition of the problem, doesn't he? I think the citation to the expert's testimony, which was that, well, one of ordinary skilled in the art could think of many ways to make these containers or other things fit into a machinery in a variety of configurations, provides the motivation to solve this very simple problem. The court's order references the patent itself, which in column five says, conventional machinery uses the openings in the bottoms of the containers to load them. And it also says conventional machinery uses only two of the openings. So that's evidence of the motivation to solve this alleged problem of covering up two of the openings so it fits in the right way as opposed to the wrong way. But where is there evidence of the particular solution recited in claim 14? There's the evidence of Lewis, which has the two openings so that it will always fit in the right way. There's evidence of the actual TI container, I think it was exhibit 251, which the judge refers to, which has been submitted to the court, hopefully you got it, which has two holes in the bottom. So the court is saying, a person of ordinary skill in the art, looking at this TI container with two holes and knowing that the conventional machinery has two prongs, knows that if there's four holes, I need to cover up two of them. That's the motivation and that's the evidence. Was there specific testimonial evidence from your expert or cross-examination from their expert or something that said, let's take as a given for a moment that these machines use two prongs for a needed alignment. In addition, the expert says, making sure that if you start with four, you have only two that the prongs can fit into is an obvious solution. Does somebody say that? Yes. Mr. Haggard, the inventor, acknowledges that the issue is a binary decision. There's two ways to do it if you have four holes. So you just have to get it right to align it so that only the two holes have openings so that it will fit over the prongs. He says that in his testimony and that's a record. That's where he's discussing market forces and what various customers require, what their loading machines require. I believe Dr. Kimmel, the expert for EPAC, testifies that in the evidence of record. But you don't have that ready to hand. I could probably find it here in a moment. I believe that even in the testimony that the court cited, which is... The court didn't actually cite things. It makes it a little hard to find what specific thing that the court was referring to in the testimony. Let me ask you something specific about your argument in your brief. On page 45 of your brief, you talk about cross-members partially blocking an opening are found throughout the prior art. And then you make the statement it's found everywhere from picket fences, gates, turnstiles, et cetera, et cetera. More specifically, the detent member 56 of Thibodeau is such a cross-member. And you refer specifically to column three, lines 57 to 65 of Thibodeau. That reference shows the downwardly projecting detent members indicated at 56. These are the detent members that push the walls in. I'm having difficulty relating that to the cross-members we're talking about. What do the detent members of Thibodeau have to do with blocking the openings on the latches? This claim just says cross-members partially blocking an opening. It doesn't talk about the motivation and the machinery. That's all the claim is. If there's something that has a member partially blocking an opening, my argument is that's prior art for that. You say that anything in any combination that blocks any opening anywhere is enough of a teaching? Yes, and that's a primary reference. I maybe have a weakness for analogies, but I noted when I walked into the courtroom today, I walked with a turnstile, which is members partially blocking an opening. In that brief, I next cite to Lewis, which talks about the circular members that go around on the inside of the container, hold the wafer, and they have openings in them. To let the robot push the wafers in there. It's the same issue of adopting the plastic container to facilitate the conventional machinery of the robot that's loading the wafers. In Lewis, it refers to a notch, number 28. I think it's page 46 of the brief, right after what you referred to. My argument is that is evidence in the primary references of a cross member partially blocking an opening. In that case, it's for the same purpose and motivation as is being read into the claim here, which is to facilitate loading this container onto machinery, or facilitate using this container with the conventional machinery that loads the wafers into the containers. These containers are to protect these wafers before they get etched and cut into little integrated circuits, so it's important that they don't break, and the robots are used to load them in and out softly. I do think there is evidence in the court's references to this knowledge of ordinary people, of ordinary skill in the art of the conventional machinery, of if I have four holes, I need to make them adopted to. The court refers to a pre-existing standard. I think this judge's fairly concise and eloquent way to explain the situation. This is a district court judge in Riverside. This is not the Eastern District of Texas or the Eastern District of Virginia. They don't get patent cases over and over, and I think that he did a pretty good job of summarizing the reasons, which was the pre-existing standard. If you look on the factual part, I guess in the conclusions of law, the court understandably doesn't cite evidence because all the evidence has been cited in the findings of fact. On this particular point, it's paragraphs 17 and 18. Can you just focus on that for a minute? On this question of having four holes would cause alignment problems, that's all he says there. Then can you talk to me about paragraph 18, where the judge describes the 200-millimeter TXAP containers have four holes, and they use a little small tab, doesn't go all the way across. What exhibits five and seven are? Five and seven were accused products. My client's products. Were they prior art products? They weren't prior art products. They were what was accused. I think his point there was... If they're not prior art products, doesn't that make it hard to say that here's some evidence of what a skilled artisan would have understood would be a good idea to do if you had four holes? Because this doesn't come until later. I'm not arguing that paragraph 18 of the findings of facts is what the court was citing as evidence in support of covering up two of the holes. I think the court was just stating a finding of fact of what he understood my client's products comprised. I'm trying to understand what the evidence is. When I look at Haggard's testimony, it's really... He said the judge cites pages 140 to 141, which are JA 163 and 164 and 5, I guess. I'm not quite sure that that's testimony about anything other than Mr. Haggard's own thought process, as opposed to what a skilled artisan would have thought by way of solutions. Again, taking as a given that a skilled artisan would understand that with this filling machine, four holes presented an alignment problem. I'm looking at the testimony right there. I think that it does support that. I'm just repeating myself. I think the Kimmel testimony does as well. I think under KSR, if you have a preexisting standard, which is admitted by the patent itself, and there's also supporting testimony from at least two witnesses that people of ordinary skill in the art knew that you needed to fit the container into the machinery in a certain way, that's sufficient under KSR. That's sufficient motivation to do something that's obvious. That's sufficient motivation to use common sense to cover up two openings. That's like having a two-prong plug and I have four holes. How do I make sure I plug it into the holes correctly? It is an exceedingly simple thing to do, which KSR has support for. That is an obvious thing to do. It's allowable for the district court to make that conclusion that if I have to fit something to a preexisting standard and it's this simple, that's sufficient motivation to do it. Moreover, when I have prior art such as Lewis, which shows the four openings, and I have prior art of Lewis, which shows two openings, then that's evidence of I can cover two and have only two openings to use to fit the thing into the device. Of course, it's not just simply, well, okay, if I cover two, then that solves the problem. The alleged invention here, claimed in Claim 14, is that the four latches were still possible. You could have four latches, but partially cover and still achieve this alignment. So it was, in effect, sort of having your cake and eating it too. You can have the latches, even though you know if there are four openings, that causes an alignment problem. But we're going to solve that by partially covering. I don't find any reference that teaches that solution. We're talking about motivation and we're talking about the problem. I get that. But the question I'm struggling with is where is there some piece of prior art that suggests the particular solution that is embodied in Claim 14? With respect to the court's finding of fact, I did my best to point to the paragraphs and footnotes that support that. I think that's on page 41 and 42 of my brief. I do think that it is supported there. I would also point out that in counter to the way that a talent is arguing this, they're saying, well, we created this new problem of having four holes in the bottom of the container and we solved that problem. That's not correct. If you took the cross member out of Claim 14, then there's no dispute, at least if Claim 13 is obvious, that the combination of Thibodeau and Lewis disclosed the container with four holes in the bottom. Four latches, therefore, four holes. It wasn't a new thing that EPAC, the appellant, came up with. Therefore, it's not as if they had this new problem to solve. It was already an old, obvious container. So, fit an old, obvious container to a pre-existing standard of machinery is not an invention. Let me try it this way, and I'm still having trouble with this. It seems to me that if you want to have four latches, you've got a problem, and that was recognized because there are four openings, so, therefore, there's an alignment issue. And if you don't have four latches, if you only have two, then there's no alignment problem. The solution here was to, in effect, have both. Okay, you can have four latches, and you can also avoid the alignment problem, and you do that by providing this cross-member. And I don't see any piece of prior art or anything else that suggests that solution, to have both a latch and an avoidance of the alignment problem by using a cross-member. So, tell me where I'm wrong. Well, the prior art clearly showed two openings. And so, that is evidence that just leave two openings, and you'll always be able to fit it into the machine the right way. That is evidence of what someone would have known. Someone would have known if you put four openings, you're going to have an alignment problem, right? Yes, and, but you haven't complicated your analysis as one of ordinary skill in the art, because you already knew that all I need is two holes, and I'm staring at the TI device that has two holes, and that's what the judge was doing. And I have LULUS that shows me two holes. So, I don't have to have something in addition. Can you just clarify this, and I realize, I apologize if this is so elementary, but the relation between the openings and the latches is what? It's called a legacy mold. That's a hook to help you remember. Do the latches go into the openings? The latches hook onto the opening. Okay. And I thought your question was, why are the openings there? So, you couldn't just close up two without sacrifice, actually close up two openings without sacrificing two of the latches. Is that right? Well, I don't know that the claim has to be, yeah, I think in claim 14, if you have four locking members and receivers, then if you close those openings completely, then I suppose it would not, at least two of those would not then latch. Well, presumably the invention is to add the two holes. Yeah. That's 13, right? That's claim 13. That's right. Now, there must be a reason for needing those two holes. Otherwise, why bother? Yes, and now I've confused. You're right, and I've confused my answer. I've confused you maybe. There's still holes in the bottom. Those don't connect to the receiver. That's not where the latch connects to. They connect in the top. So, if you cover two on the bottom, you aren't going to frustrate the ability of these latches to go together. I think that was your question, and that's the answer. So, you're not sacrificing anything about the latching by saying two holes instead of four. Right. I was kind of thinking about the answer. Did I address your question? Okay. I think we need to move on. Thank you very much. Is that right about the simple mechanical issue that we're talking about? These openings that we're talking about putting a cross member to bifurcate are not used for the latching. Correct. They're used for the placement on the machine. And the inventor, Mr. Haggard, testified on A-59. He had never thought of it before until he actually had to invent it. And he said, and so we really had to think about, well, you know, how to address this. And there were a number of ways we could have addressed it, but, no, it wasn't obvious. Why did he make four holes on the bottom when all that did was create a problem with alignment? Why didn't he just leave the two holes on the bottom and put the four holes on the top? Your Honor. There must be some technical reason. Do we have an engineer in the building? Yeah, we do. The engineer says you can't mold them without the holes. You can't mold them without the holes. You need the holes for the molding process. All four of them? Yes. All right, let's assume that's the case. So he says to himself, I have an invention. I'm going to use four holes on the top for the latches. This is really latches. And then he says, well, I need four holes on the bottom for manufacturing purposes, whatever. And then he says, well, that screws up the alignment, so I better figure out a way to make those holes usable for manufacturing purposes, but not get in the way of the alignment. Right? Correct. And he came up with one way of many. He came up with one way of several. He picked one. That's exactly what the inventive process is about. And because there was no testimony at trial any different, I mean, the inventor said it wasn't obvious. There were a number of different ways. Our expert said it wasn't obvious. There were a number of ways. Their expert didn't testify about it at all. So what the judge did is, in a somewhat results-based decision, said, well, there's no evidence of obviousness for Claim 14, so I'm going to say it's inherent. It's inherent. It just makes sense. It just makes sense to do it that way. And because of that, the invention is obvious. Well, that's not the proper, legally and factually, actually, that's not the proper way. But I think KSR has broadened out that whole way of thinking about this. Don't you think that? It has opened up what can be considered for the reason to combine. It does not allow an inherency test to make up for missing elements. No, I do not think that's what KSR has done, Your Honor. And in the – well, I don't have any time left. Take another minute. If I could just say, there is a dispute as to Claim 13. And I will say it in 30 seconds or no less, no more. That, I'm sorry, you don't get to do. You don't get to make an argument on rebuttal that you didn't make in the opening because Mr. Walker can't respond. Sorry about that. Am I able to talk about secondary considerations? I did start to mention that. Sure, take half a minute. I will just say, there is no evidence. They did not talk about secondary considerations. We did. The factual finding of the judge to say our product is not a commercial success when the evidence was that it was a great commercial success, they say it's because your client chose your design instead of Texas Instruments' old design. In other words, the court said it wasn't a commercial success because it was a commercial success. In other words, everything about commercial success supports us. It supports EPAC's position. Skepticism. How do you square your long-felt need contention with your separate contention, which we haven't talked about and maybe this is because of Claim 13, I'm not sure, that nobody using Thibodeau would have been looking around to do anything different because it was a perfectly satisfactory product? Thibodeau was satisfactory for a lead frame and for a releasably secure lead frame. They didn't need a latch because, in effect, a latch would not work with Thibodeau. It would go contrary to the purpose of Thibodeau. There was a long-felt need, as their own expert testified, for a reduced movement canister that contained on the side and contained up above. That had not been met until EPAC's invention. That was around since 1993 was the need for a reduced movement canister, which we solved. Okay. Well, thank you very much. Thank you. Thanks to both.